## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CHROMADEX, INC. and
TRUSTEES OF DARTMOUTH
COLLEGE,

               Plaintiffs,

        v.

ELYSIUM HEALTH, INC.,

            Defendant.

C.A. No. 18-1434-CFC

## PLAINTIFFS CHROMADEX, INC. AND TRUSTEES OF DARTMOUTH COLLEGE'S COMBINED ANSWERING BRIEF IN OPPOSITION TO DEFENDANT ELYSIUM HEALTH, INC.'S RULE 12(b)(1) MOTION TO DISMISS CHROMADEX, INC.'S CLAIMS, AND REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO <u>AMEND COMPLAINT</u>

## **TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................... 1

II.     FACTUAL BACKGROUND.......................................................... 3

        A.      The Asserted Patents ........................................................ 3

        B.      ChromaDex Obtained an Exclusive License to the Asserted
                Patents.............................................................................. 3

        C.      Elysium's Attempts to Destroy ChromaDex and Its Exclusive
                License to the Asserted Patents......................................... 4

        D.      Healthspan Was Acquired to Compete in the Direct-to-
                Consumer Market .............................................................. 7

        E.      Elysium Willfully Infringed the Asserted Patents, Forcing
                Plaintiffs to File this Action ............................................. 9

III.    LEGAL STANDARD .................................................................. 10

IV.     ARGUMENT................................................................................ 11

        A.      Elysium's Motion Misinterprets Federal Circuit Precedent .............. 11

        B.      Elysium Could Not Have Obtained a License to the Asserted
                Patents, and Thus ChromaDex and Healthspan Are Each
                Exclusive Licensees with Standing to Sue Elysium ......................... 14

V.      CONCLUSION............................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acceleration Bay LLC v. Activision Blizzard, Inc.*,
    No. CV 16-453-RGA, 2017 WL 3668597 (D. Del. Aug. 24, 2017) ............19, 20

*Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*,
    604 F.3d 1354 (Fed. Cir. 2010) ........................................................................11

*ChromaDex, Inc. v. Elysium Health, Inc.*,
    No. 8:16-cv-02277 (C.D. Cal.) ...........................................................................4

*Davis v. Wells Fargo*,
    824 F.3d 333 (3d Cir. 2016) .........................................................................4, 10

*In re Elysium Health-ChromaDex Litig.*,
    No. 1:17-cv-07394 (S.D.N.Y.) .............................................................................4

*Foman v. Davis*,
    371 U.S. 178 (1962)...........................................................................................10

*Luminara Worldwide, LLC v. Liown Elecs. Co.*,
    No. 14-CV-3103, 2015 WL 11018002 (D. Minn. Apr. 20, 2015) .......................1

*Madey v. Duke Univ.*,
    307 F.3d 1351 (Fed. Cir. 2002) ........................................................................10

*Mars, Inc. v. Coin Acceptors, Inc.*,
    527 F.3d 1359 (Fed. Cir. 2008) ............................................................2, 13, 14

*Medtronic Sofamor Danek USA, Inc. v. Globus Med., Inc.*,
    637 F. Supp. 2d 290 (E.D. Pa. 2009), *aff'd sub nom. Warsaw
    Orthopedic, Inc. v. Globus Med., Inc.*, 416 F. App'x 67 (Fed. Cir.
    2011) .................................................................................................................20

*Monsanto Co. v. Aventis Cropscience SA*,
    226 F. Supp. 2d 531 (D. Del. 2002)...........................................................19, 20

*Novartis Pharm. Corp. v. Teva Pharm. USA, Inc.*,
    No. 05-CV-1887, 2009 WL 3447232 (D.N.J. Oct. 21, 2009) ...........................20

*Novozymes A/S v. Genencor International, Inc.*,
474 F. Supp. 2d 592 (D. Del. 2007).................................................................17

*Ortho Pharmaceutical Corp. v. Genetics Institute, Inc.*,
52 F.3d 1026 (Fed. Cir. 1995) ...........................................................14

*Poly-America, L.P. v. GSE Lining Technology, Inc.*,
383 F.3d 1303 (Fed. Cir. 2004) .........................................................17

*Rite-Hite Corp. v. Kelley Co.*,
56 F.3d 1538 (Fed. Cir. 1995) ...........................................................14

*Spine Solutions., Inc. v. Medtronic Sofamor Danek USA, Inc.*,
620 F.3d 1305 (Fed. Cir. 2010), *abrogated on other grounds by
Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923 (2016) .............18, 19, 20

*WiAV Solutions LLC v. Motorola, Inc.*,
631 F.3d 1257 (Fed. Cir. 2010) .................................................*passim*

## Other Authorities

Fed. R. Civ. P. 12(b)(1)...........................................................9, 10, 20, 22

Fed. R. Civ. P. 15(a)..............................................................................10

Fed. R. Civ. P. 15(a)(2)...........................................................................10

## I.       INTRODUCTION

Elysium asks the Court "to dismiss all claims of Plaintiff ChromaDex Inc. [("ChromaDex")] for lack of subject matter jurisdiction"[1]—and to deny Plaintiffs' motion for leave to amend its Complaint to add as a co-Plaintiff Healthspan Research, LLC ("Healthspan"), a sister company of ChromaDex wholly owned by the same corporate parent—on the ground that there cannot be more than one "exclusive" licensee. D.I. 58. But the fundamental premise of Elysium's motion— that "exclusive" means "only one"—could not be more wrong. Applying the Federal Circuit's authoritative discussion of patent standing in *WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257 (Fed. Cir. 2010), courts have explained that "the term 'exclusive' must not necessarily imply 'sole' or 'only,'" and that "a licensee may have an 'exclusive license,' even though others … may retain a license to practice the patent as well." *Luminara Worldwide, LLC v. Liown Elecs. Co*., No. 14-CV-3103 (SRN/FLN), 2015 WL 11018002, at *12 (D. Minn. Apr. 20, 2015) (citing *WiAV*, 631 F.3d at 1266–67).

Elysium appeals to "logic" to argue that "[p]atent rights held by two different entities that are allegedly injured by the same conduct cannot possibly be exclusive." D.I. 59 ("Mot.") at 9. But *WiAV* rejected this supposed "logic" out of hand. There,

---

[1] Notably, Elysium does not dispute the Court's subject matter jurisdiction over the case itself, given that Dartmouth, the owner of the Asserted Patents, is a plaintiff. But as discussed herein, ChromaDex and Healthspan are also entitled to participate to enforce their right to exclude Elysium's infringement of the Asserted Patents.

the Federal Circuit explained that patent standing does not depend on whether the plaintiff can exclude infringement by *everyone*, but instead on whether the plaintiff can exclude infringement by *the defendant*. *WiAV*, 631 F.3d at 1266–67. A critical component of that inquiry is whether the defendant can obtain a license to practice the patent from another entity. *Id.* If it cannot, then the plaintiff has standing to sue that defendant, even if the plaintiff may not have standing to sue another party that can obtain such a license. *Id.* Elysium's citations of decisions predating *WiAV*—such as *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359 (Fed. Cir. 2008), which was expressly distinguished in *WiAV* by the same judge who authored *Mars*—are not persuasive.

Under a straightforward application of *WiAV* to the facts of this case, ChromaDex and Healthspan are exclusive licensees with standing to sue Elysium. They have the express "right to exclude others from practicing" U.S. Patent Nos. 8,383,086 and 8,197,807 (collectively, the "Asserted Patents"), and Elysium "does not possess, and is incapable of obtaining, a license [to the Asserted Patents] from any other party." *WiAV*, 631 F.3d at 1266–67. Elysium's argument that it could have obtained a license from either ChromaDex or Healthspan, Mot. at 9, 11, is frivolous. *See infra* § IV.B. Thus, ChromaDex and Healthspan have standing to bring this action. Elysium's motion to dismiss should be denied, and Plaintiffs' motion for leave to amend should be granted.

2

## II.   FACTUAL BACKGROUND

### A.   The Asserted Patents

The Asserted Patents are owned by Plaintiff Trustees of Dartmouth College ("Dartmouth") and directed to "Nicotinamide Riboside Kinase Compositions and Methods for Using the Same." Nicotinamide riboside ("NR") is a unique form of vitamin B3 that increases cellular metabolism, mitochondrial function, and energy production. D.I. 1, ¶ 24. Dr. Charles Brenner, the inventor of the Asserted Patents, discovered while employed as a faculty member at Dartmouth that isolated NR provides an independent and previously unknown route to the production in humans of oxidized nicotinamide adenine dinucleotide (NAD+), a coenzyme vital to cellular function. *Id.*

### B.   ChromaDex Obtained an Exclusive License to the Asserted Patents

Early on, ChromaDex recognized the huge potential of NR. In July 2012, ChromaDex and Dartmouth executed an Exclusive License Agreement (the "Original Agreement") that granted ChromaDex "and its Subsidiaries an <u>exclusive</u>, royalty-bearing license" to the Asserted Patents. D.I. 50, Ex. C § 2.01 (emphasis in original); *see also* D.I. 1, Compl. ¶¶ 4, 10. This exclusive license, among other things, granted the right "to make, have made, use, and/or sell Licensed Products …." D.I. 50, Ex. C § 2.01. The Original Agreement also granted the right to sublicense and sue for infringement. *Id.* §§ 2.02, 8.01. In 2014, after substantial

3

investment in investigations and development, ChromaDex began producing and selling commercial batches of isolated NR under the tradename NIAGEN® to companies that market direct-to-consumer products. Friedman Decl. ¶ 3; D.I. 1, ¶¶ 8, 18–19.

### C. Elysium's Attempts to Destroy ChromaDex and Its Exclusive License to the Asserted Patents

One of the about 45 direct-to-consumer companies to which ChromaDex sold NIAGEN was Elysium, for incorporation into its BASIS® product. D.I. 1, ¶ 20. Elysium, however, wanted the NR market all to itself. Thus, not long after its commercial relationship with ChromaDex began, Elysium set a course to "destroy" ChromaDex and "take control" of the NR market.[2] *See* Ex. A[3] at 232, 249.[4]

Elysium recruited the assistance of Mark Morris—ChromaDex's then-Vice President of Sales and Marketing and the primary account manager for Elysium.

---

[2] Elysium's destructive plot led ChromaDex to sue Elysium in 2016 in the U.S. District Court for the Central District of California, alleging breach of contract, breach of fiduciary duty, aiding-and-abetting breach of fiduciary duty, and misappropriation of trade secrets. *See ChromaDex, Inc. v. Elysium Health, Inc.*, No. 8:16-cv-02277 (C.D. Cal.). Since 2017, ChromaDex and Elysium have also been in litigation in the U.S. District Court for the Southern District of New York, with mutual allegations of, *inter alia*, false advertising, unfair competition, and deceptive business practices. *See In re Elysium Health-ChromaDex Litig.*, No. 1:17-cv-07394 (S.D.N.Y.).

[3] Citations to "Ex." refer to exhibits to the attached Declaration of Adam W. Poff.

[4] Because Elysium "attacks the factual allegations underlying the complaint's assertion of jurisdiction," the court may "weigh and consider evidence outside the pleadings." *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016). These facts are directly relevant to Elysium's contention that it could have obtained a license from ChromaDex or Healthspan.

Morris provided Elysium with inside information about ChromaDex's NR supply and patents, including trade secrets regarding ChromaDex's customer sales and other valuable financial information *See* Ex. B at 4–9. Morris and Elysium gleefully expressed their desire to crush ChromaDex. For example, Morris texted Dan Alminana, Elysium's Chief Operating Officer, that "I want to destroy them!" Ex. A at 249. Morris also said he could not wait to join Elysium so that they could, together, "make [ChromaDex's] worst nightmares come true!" *Id.* at 232. Alminana responded: "Time to take control of everything!" *Id.*

Elysium's plot against ChromaDex began in earnest in June 2016, when Elysium ordered two unusually large shipments of NIAGEN with no intention to pay for them. Sure enough, when the shipments were delivered in August 2016, Elysium refused to pay, asserting baseless breach of contract claims. *See* Ex. B. Through this stockpile, Elysium intended to inflict financial chaos on ChromaDex while at the same time giving itself a runway to steal away ChromaDex's exclusive license to the Asserted Patents while it looked for an alternative source for NR. *See* Ex. C at 427–31; Ex. D at 446–47.

Elysium concurrently began a misinformation campaign to undermine ChromaDex's relationship with Dartmouth and position itself to steal ChromaDex's exclusive license. For example, relying on the financial harm it had inflicted by refusing to pay for the two large NIAGEN shipments, Elysium falsely told

Dartmouth that ChromaDex was insolvent. *See* Ex. C at 427–31. Elysium was motivated to steal ChromaDex's exclusive license not only by its desire to destroy ChromaDex, but also by its recognition, based on Morris's analysis, that the Asserted Patents are valid and infringed by Elysium's BASIS Product. *See, e.g.*, Ex. A at 250 ("We need those patents!").

Brazenly, Elysium made no attempt to hide its assault on ChromaDex's exclusive license. For example, Elysium shared its plot with potential investors: on August 14, 2016, Elysium's CEO Eric Marcotulli emailed Dan Giovacchini and Justin Roberts at General Catalyst—a company deeply involved in Elysium's financing—informing them that Elysium was "making some very important, strategic moves" and detailing Elysium's plan to "own (1) the molecular structure of NR and (2) broad use patents that will, if successful, give us global control of the entire NR market." Ex. E at 567. Elysium even celebrated its anticipated success, with Marcotulli (incorrectly) texting Morris that "Dartmouth is revoking the patent!!" Ex. F at 479. But Dartmouth did not revoke ChromaDex's exclusive license, nor did it grant a license to Elysium. Elysium subsequently attempted to invalidate the Asserted Patents through IPRs, but those efforts also failed. D.I. 33 at 5–6.

### D.  Healthspan Was Acquired to Compete in the Direct-to-Consumer Market

In March 2017, following Elysium's failed attempt to bankrupt the ChromaDex organization, ChromaDex Corporation, the parent of ChromaDex, acquired Healthspan to allow the ChromaDex organization to market directly to consumers. Friedman Decl. ¶ 4; D.I. 59-1, Ex. 1 at 5. Specifically, Healthspan sells the TRU NIAGEN® dietary supplement, which incorporates NIAGEN, directly to consumers. Friedman Decl. ¶ 3; D.I. 1, ¶ 8; D.I. 50, Ex. A. ¶ 9. Healthspan's sales of TRU NIAGEN compete directly with Elysium's sales of BASIS. Friedman Decl. ¶ 4; D.I. 50, Ex. A. ¶¶ 9, 13.

From the beginning, "[ChromaDex] treated Healthspan as if it were a licensed 'Subsidiary' under the 2012 [Original] Agreement and paid royalties to Dartmouth on Healthspan's sales of [TRU NIAGEN]." D.I. 50, Ex. E at 1–2. In September 2019, this "course of conduct" was made "explicit" in the Restated and Amended Exclusive License Agreement between ChromaDex and Dartmouth (the "Restated Agreement"), as explained in the parties' concurrently executed Side Letter Agreement. *Id.* The Restated Agreement changed "Subsidiaries" in the Original Agreement to "Affiliates" to reflect "the actual corporate relationship of [ChromaDex] and Healthspan," D.I. 50, Ex. D §§ 1.05, 2.01; D.I. 50, Ex. E at 1–2,[5]

---

[5] Elysium asserts that, based on the Side Letter Agreement, "ChromaDex, by its own admission, did not have standing as of the date this litigation was filed." Mot. at 15.

and expressly listed Healthspan in its schedule of affiliates, D.I. 50, Ex. D at Sch. I. The Restated Agreement granted ChromaDex "and its Affiliates an <u>exclusive</u>. royalty-bearing license" to the Asserted Patents, including the rights "to make, have made, use, and/or sell Licensed Products …." D.I. 50, Ex. D § 2.01 (emphasis in original). It also authorized "[ChromaDex] and its Affiliates" to "grant sublicenses to third parties … with the consent of Dartmouth, which consent shall not be unreasonably withheld," *id.* § 2.02, and "to commence proceedings in their own names against [an] infringer," *id.* § 8.01. The Restated Agreement is retroactively effective to March 13, 2017—the date of Healthspan's first sale of TRU NIAGEN. D.I. 50, Ex. E at 1–2.

ChromaDex and Healthspan are not only sister companies (both wholly owned subsidiaries of ChromaDex Corporation) but are also both managed by "the same executive management team" as ChromaDex Corporation, and have been since this litigation was filed. Friedman Decl. ¶¶ 3, 5–6. This common executive management team includes Rob Fried as CEO,[6] Kevin Farr as CFO, and Mark Friedman as General Counsel and Secretary. *Id.* ¶ 5. The executive management

---

Not so. For the reasons explained below, ChromaDex had standing when this litigation was filed and has had standing ever since.

[6] Healthspan does not have its own CEO, but instead is managed by Rob Fried in his capacity as CEO of ChromaDex Corporation. Friedman Decl. ¶ 5 n.1.

team makes all decisions "in the interests of the ChromaDex corporate family as a whole and its shareholders." *Id.* ¶ 6.

### E.   Elysium Willfully Infringed the Asserted Patents, Forcing Plaintiffs to File this Action

Undeterred by its failure to either steal ChromaDex's exclusive license or invalidate the Asserted Patents through IPRs, Elysium continued to infringe the Asserted Patents by making and selling its BASIS dietary supplement using isolated NR from a source other than ChromaDex. Nonetheless, Elysium continued to promote its BASIS product with reference to investigations conducted using BASIS formulated with NIAGEN. D.I. 1, ¶ 23.

Plaintiffs filed this action on September 17, 2018. On June 19, 2019, the case was stayed. The stay was lifted on February 4, 2020, and the Court held a scheduling conference on March 10, 2020. Under the scheduling order, the deadline to amend pleadings is July 10, 2020; fact discovery closes January 8, 2021; and trial is scheduled to begin September 27, 2021.

On April 24, 2020, Plaintiffs filed a motion for leave to amend their complaint to add Healthspan as a co-Plaintiff. D.I. 50. On May 5, 2020, Elysium filed a motion to dismiss ChromaDex's claims pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction, combined with Elysium's opposition to Plaintiffs' motion for leave to amend their complaint.

## III.   LEGAL STANDARD

In a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the plaintiff "ha[s] the burden of proof that jurisdiction does in fact exist." *Davis*, 824 F.3d at 346 (internal quotation marks omitted). If the defendant "attacks the factual allegations underlying the complaint's assertion of jurisdiction," then the court may "weigh and consider evidence outside the pleadings." *Id.* (internal quotation marks omitted); *see Madey v. Duke Univ.*, 307 F.3d 1351, 1358 (Fed. Cir. 2002) (regional circuit law applies to "[a] dismissal for lack of subject matter jurisdiction"). Here, Elysium has mounted such a factual challenge by disputing Plaintiffs' factual allegation that "ChromaDex and Healthspan are exclusive licensees under the '807 and '086 patents in various fields, including dietary supplements." D.I. 50, Ex. A ¶ 4; *see also* D.I. 1, ¶ 4.

Regarding Plaintiffs' motion for leave to amend, Rule 15(a) provides that leave to amend should be "freely give[n] … when justice so requires," Fed. R. Civ. P. 15(a)(2), and "this mandate is to be heeded," *Foman v. Davis*, 371 U.S. 178, 182 (1962). Elysium's only objection to Plaintiffs' motion is that the proposed amendment is allegedly futile because, "[l]ike ChromaDex, Healthspan is not an exclusive licensee, and it therefore lacks constitutional standing." Mot. at 16.

## IV.   ARGUMENT

Elysium's motion fails to recognize or apply the Federal Circuit's test for when an exclusive licensee has standing to sue for patent infringement. When that test is applied here, it is clear that ChromaDex and Healthspan are each exclusive licensees of the Asserted Patents with standing to sue Elysium.

### A.   Elysium's Motion Misinterprets Federal Circuit Precedent

An "exclusive" licensee "has an exclusionary right in a patent" that is violated by a defendant's infringement, thus causing the exclusive licensee injury sufficient for constitutional standing to sue for infringement. *WiAV*, 631 F.3d at 1264–65.[7] A "non-exclusive" or "bare" licensee, by contrast, "holds nothing more than a promise from the patentee … not [to] sue the licensee," and thus does not have standing to sue because it is not injured by a defendant's infringement. *Id.* The question is: what does it mean to be an exclusive licensee with an exclusionary right in a patent?

Elysium argues that "a company cannot be the 'exclusive' licensee of a patent if others are also given a license covering the same field and the same territory." Mot. at 9. As Elysium's counsel explained in an email to Plaintiffs' counsel: "Our motion is straightforward. 'Exclusive' means only one. Dartmouth has at least two licensees, and neither can claim to be Dartmouth's 'exclusive licensee.'" Ex. G.

---

[7] An exclusive licensee that was not granted "all substantial rights" in a patent must normally join the patentee as a plaintiff, but that is not at issue here because Dartmouth is already a plaintiff. *See Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*, 604 F.3d 1354, 1358–59 (Fed. Cir. 2010).

*WiAV* expressly rejected Elysium's position. 631 F.3d at 1266 (rejecting the defendants' argument "that for a licensee to be an exclusive licensee of a patent, the licensee must be the *only* party with the ability to license the patent"). *WiAV* explained that "exclusive license" has a special meaning in the patent standing context: it is not based on whether the plaintiff can exclude infringement by *everyone*, but instead on whether the plaintiff can exclude infringement by *the defendant*, which is determined by whether the defendant could obtain a license to practice the patent from anyone else. *Id.* at 1266–67. The court reasoned that, "[b]ecause an exclusive licensee derives its standing from the exclusionary rights it holds, it follows that its standing will ordinarily be coterminous with those rights." *Id.* at 1266. An exclusive licensee may have exclusive rights against, and thus standing to sue, "some parties and not others." *Id.* For example, an exclusive licensee could not exclude "a party who has the ability to obtain … a license from another party with the right to grant it," and thus the exclusive licensee would not have standing to sue that party. *Id.* By contrast, however, "if an exclusive licensee has the right to exclude others from practicing a patent, and a party accused of infringement does not possess, and is incapable of obtaining, a license of those rights from any other party, the exclusive licensee's exclusionary right is violated," and the exclusive licensee has standing to sue for infringement. *Id.* at 1266–67.

In *WiAV*, the plaintiff was ***one of seven licensees*** with the rights to practice and sublicense the asserted patents in the same "Wireless Handset field." *Id.* at 1260.[8] Even though there were numerous licensees in the same field, the Federal Circuit held that the plaintiff was an exclusive licensee with standing to sue the defendants because it had been expressly granted exclusive rights to the asserted patents, and none of the other six licensees "ha[d] the right to extend licenses to the Defendants in [the Wireless Handset field]." *Id.* at 1267. Because the defendants could not obtain a license from anyone else, the Plaintiff "ha[d] the right under the patents to exclude *the Defendants* from engaging in the alleged infringing activity and therefore [was] injured by the Defendants' conduct." *Id.* at 1267 (emphasis in original).

Elysium cites the statement in *Mars* that "if the patentee *allows* others to practice the patent in the licensee's territory, then the licensee is *not* an exclusive licensee." Mot. at 10 (emphases in original) (quoting *Mars*, 527 F.3d at 1368). But Judge Linn, who authored both *Mars* and *WiAV*, explained in *WiAV* that *Mars* is "inapposite" to *express* exclusive licenses because *Mars* "addressed whether a party was an *implied* exclusive licensee of the patents in suit in the absence of a written agreement explicitly granting the party exclusionary rights in the patents." *WiAV*,

---

[8] Elysium is incorrect that the six other licensees in *WiAV* held rights "in different fields." Mot. at 10.

631 F.3d at 1266. Put differently, *Mars* "merely explained that courts will not imply an exclusive license when there is no indication that the licensor granted its licensee any of the exclusionary rights in a patent," and it "did not suggest that a party holding the right to exclude an alleged infringer from practicing a patent does not have standing to sue." *Id. Mars* is thus consistent with *WiAV*'s holding that a plaintiff suffers injury from a defendant's infringement, and has constitutional standing to sue, when it has an express exclusive license and the defendant could not have obtained a license from anyone else.[9]

### B. Elysium Could Not Have Obtained a License to the Asserted Patents, and Thus ChromaDex and Healthspan Are Each Exclusive Licensees with Standing to Sue Elysium

Elysium argues that ChromaDex and Healthspan "are non-exclusive licensees" because their licenses both "cover the same" patent rights and include the right to sublicense, and thus "either company" could allegedly "license Elysium's allegedly infringing activity, and neither has the power to independently exclude Elysium from engaging in that activity." Mot. at 9, 11; *see also id.* at 16 ("At all

---

[9] Similarly, *Ortho Pharmaceutical Corp. v. Genetics Institute, Inc.*, 52 F.3d 1026 (Fed. Cir. 1995), is inapposite because the licensee there did not have an express exclusive license, but merely an implied nonexclusive license. And in *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538 (Fed. Cir. 1995), "[t]he ISOs were not licensees under the patent, except perhaps as non-exclusive licensees by implication. … These agreements were simply sales contracts between Rite–Hite and its independent distributors." *Id.* at 1553.

14

relevant times, ChromaDex **could have granted** a license to Elysium under the express terms of the Restated License Agreement." (emphasis added)).

Elysium misstates the legal standard. The question is not whether ChromaDex or Healthspan "could have granted a license" in the abstract. If that were true, every exclusive licensee with the right to sublicense would lack standing to sue for patent infringement because it "could have granted" a sublicense to the defendant. That is obviously wrong. Instead, as the Federal Circuit held in *WiAV*, the question is whether the defendant could have obtained a license:

> If the accused *neither possesses nor can obtain such a license* [to the asserted patents], the exclusive licensee's exclusionary rights with respect to that accused party are violated by any acts of infringement that such party is alleged to have committed, and the injury predicate to constitutional standing is met.

631 F.3d at 1267 (emphasis added); *see also id.* at 1266–67 (plaintiff has standing where defendant "*does not possess, and is incapable of obtaining*, a license of those rights from any other party" (emphasis added)).

Even Elysium does not try to argue that it could have obtained a license to the Asserted Patents from ChromaDex or Healthspan, and for good reason. ChromaDex and Elysium have been at war since Elysium began attempting to "destroy" ChromaDex and "take control" of the NR market for itself. *See supra* § II.C. As discussed above, Elysium attacked ChromaDex on two fronts: *first*, it ordered two unusually large shipments of NIAGEN and refused to pay for them, and *second*, it

executed a misinformation campaign in hopes of convincing Dartmouth to give it ChromaDex's exclusive license, including by citing ChromaDex's financial strain caused by Elysium itself. *See* Ex. B at 4–9; Ex. C at 427–31.

Although Elysium ultimately failed to either destroy ChromaDex or obtain a license from Dartmouth, its relentless campaign to destroy ChromaDex has led to numerous ongoing litigations between the parties, including litigations in the Central District of California and the Southern District of New York that were already pending when this case was filed in September 2018. Elysium clearly could not have obtained a license from ChromaDex or Healthspan while it was at war with the entire ChromaDex organization, and any assertion to the contrary is frivolous.

Elysium's argument incorrectly assumes that ChromaDex and Healthspan are independently managed entities with the ability to take actions that would harm the other. This is incorrect, as Elysium is well aware. Not only are Healthspan and ChromaDex both wholly owned by ChromaDex Corporation, but all three entities are managed (and have been since this litigation was filed) by a single executive management team that makes all decisions in the interests of the ChromaDex corporate family as a whole and its shareholders. *Id.* ¶¶ 3, 5–6.

Mr. Friedman, the ChromaDex entities' General Counsel and Secretary, has submitted a declaration explaining that any license to Elysium "would have needed to be approved by the [ChromaDex entities' common] CEO," and he declared

16

"definitively and without reservation that Elysium would not have been able to obtain a license to the Asserted Patents from ChromaDex or Healthspan … when it was trying to destroy the ChromaDex organization and was in active litigation against the ChromaDex organization" in California and New York. Friedman Decl. ¶ 7.[10] Moreover, granting Elysium a license would have undercut Healthspan's sales of TRU NIAGEN and undermined ChromaDex Corporation's very reason for acquiring Healthspan: to compete in the direct-to-consumer market. Friedman Decl. ¶ 4; *see also* D.I. 59-1, Ex. 1 at 5.[11]

Elysium argues that "corporate form matters for purposes of injury in patent cases," Mot. at 14–15, but this is consistent with Plaintiffs' argument that ChromaDex's and Healthspan's corporate affiliation is one fact among many others that together show that Elysium could never have obtained a license from either ChromaDex or Healthspan. Moreover, the cases Elysium cites are inapposite. *Poly-America, L.P. v. GSE Lining Technology, Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004), and *Novozymes A/S v. Genencor International, Inc.*, 474 F. Supp. 2d 592, 596 (D. Del. 2007), both concerned whether a company could recover the lost profits of an

---

[10] By executing a single agreement to grant ChromaDex and Healthspan co-exclusive licenses, Dartmouth, ChromaDex, and Healthspan recognized that, practically speaking, the co-licenses were not wholly independent, but instead were for sister companies under common control.

[11] The cooperation between Healthspan and ChromaDex—in which Healthspan sells TRU NIAGEN, incorporating NIAGEN from ChromaDex, directly to consumers—illustrates why it makes sense as a business matter for affiliated companies to hold co-exclusive licenses.

affiliate that was a nonexclusive licensee. *Spine Solutions., Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1317 (Fed. Cir. 2010), *abrogated on other grounds by Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923 (2016), held that, where an exclusive license was not granted expressly, it would not be implied based solely on the parties' corporate organization. Furthermore, none of Elysium's cited cases considered affiliates that were run by the same management team, nor where a member of that management team submitted a declaration definitively stating that none of the affiliates would have granted the defendant a license.

Elysium's argument that ChromaDex or Healthspan "could have granted a license to Elysium under the express terms of the Restated License Agreement," Mot. at 16, is also baseless for another reason. Under the Restated Agreement (as well as the Original Agreement), any sublicense of the Asserted Patents requires Dartmouth's consent. D.I. 50, Ex. C § 2.02. Notably, Elysium does not argue that Dartmouth would have consented to a sublicense, and for good reason: Elysium *actually tried* in 2016 to obtain a license to the Asserted Patents, and Dartmouth *refused*. In 2018, moreover, Dartmouth and ChromaDex sued Elysium for patent infringement, confirming that Dartmouth had no intention to grant Elysium a license.

Under the straightforward facts of this case, both ChromaDex and Healthspan are exclusive licensees with the right to exclude Elysium's infringement. The Restated Agreement expressly granted ChromaDex and Healthspan "the right to

18

exclude others from practicing" the Asserted Patents, and Elysium "does not possess, and is incapable of obtaining, a license [to the Asserted Patents] from any other party." *WiAV*, 631 F.3d at 1266–67. Indeed, Elysium has not offered any reason to believe it could have obtained a sublicense from either ChromaDex or Healthspan, but instead merely relies on an incorrect legal standard to argue that ChromaDex or Healthspan "could have" granted it a license, notwithstanding the facts showing that neither of them would have done so. Thus, ChromaDex's and Healthspan's "exclusionary right is violated," and they have standing to sue for infringement. *Id.*

Elysium cites several cases purporting to hold that "a licensee cannot share the same 'exclusive' rights with another licensee." Mot. at 11–14 (citing *Acceleration Bay LLC v. Activision Blizzard, Inc.*, No. CV 16-453-RGA, 2017 WL 3668597 (D. Del. Aug. 24, 2017); *Monsanto Co. v. Aventis Cropscience SA*, 226 F. Supp. 2d 531 (D. Del. 2002); *Medtronic Sofamor Danek USA, Inc. v. Globus Med., Inc.*, 637 F. Supp. 2d 290, 307 (E.D. Pa. 2009), *aff'd sub nom. Warsaw Orthopedic, Inc. v. Globus Med., Inc.*, 416 F. App'x 67 (Fed. Cir. 2011)). However, *Monsanto* and *Medtronic* both predate *WiAV* and did not apply its standards. The only cited case post-dating *WiAV*, *Acceleration Bay*, is inapposite. There, the court found that the plaintiff did not have "the right under the patents to exclude the Defendants from engaging in the alleged infringing activity" because the defendants, developers of

19

games for the Sony videogame platform, "had the ability to obtain a license from [nonparty] Sony." *Acceleration Bay LLC*, 2017 WL 3668597, at *3. Those facts are far different from the facts here, where ChromaDex and Healthspan would not have granted Elysium a license because, for example, Elysium tried to destroy the ChromaDex organization; Elysium and the ChromaDex organization were already engaged in several litigations when this suit was filed; and Elysium competes with the ChromaDex organization in the direct-to-consumer market.[12]

Even if there were uncertainty regarding whether Elysium could have obtained a license from ChromaDex or Healthspan, a dismissal under Rule 12(b)(1) would be improper because the facts raise at least a genuine dispute regarding whether Elysium could have obtained such a license. *See Novartis Pharm. Corp. v. Teva Pharm. USA, Inc.*, No. 05-CV-1887, 2009 WL 3447232, at *4 (D.N.J. Oct. 21, 2009) ("At this time, there is insufficient evidence to render a finding whether NPC and NPAG hold exclusive licenses permitting standing in this matter. Therefore, this issue of fact will be resolved before the trier of fact in this case."). The Court, however, need not even address that issue because ChromaDex and Healthspan have

---

[12] These unique facts are also absent from *Monsanto* and *Medtronic*. Moreover, the distribution agreement considered in *Medtronic* was critically different from the Restated Agreement because "the distribution agreement appoints Medtronic USA as '*a*' distributor of the patented products, not the sole distributor," and "[a]bsent from the distribution agreement is any express or implied promise that Warsaw will refrain from appointing other distributors." 637 F. Supp. 2d at 307 (emphasis in original).

made more than a sufficient factual showing that they have the right to exclude Elysium's infringement and that Elysium could not have obtained a license to the Asserted Patents. Thus, ChromaDex and Healthspan have standing to bring this action.

## V.     CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Elysium's motion to dismiss and grant Plaintiffs' motion for leave to amend their complaint.

Dated: May 19, 2020

*Of Counsel:*
Christopher N. Sipes
R. Jason Fowler
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000

James F. Haley, Jr.
HALEY GUILIANO LLP
75 Broad Street
Suite 1000
New York, NY 10004
(646) 973-2500

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Adam W. Poff*
Adam W. Poff (No. 3990)
Pilar G. Kraman (No. 5199)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
apoff@ycst.com
pkraman@ycst.com

*Attorneys for Plaintiffs ChromaDex, Inc. and Trustees of Dartmouth College*

## <u>WORD COUNT CERTIFICATION</u>

The undersigned counsel hereby certifies that Plaintiffs' Combined Answering Brief in Opposition to Defendant Elysium Health, Inc.'s Rule 12(b)(1) Motion to Dismiss ChromaDex, Inc.'s Claims, and Reply Brief in Support of Plaintiffs' Motion for Leave to Amend Complaint contains 4994 words (exclusive of the title, caption, and signature block) in Times New Roman 14-point font.

Dated: May 19, 2020

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Adam W. Poff*
Adam W. Poff (No. 3990)
Pilar G. Kraman (No. 5199)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
apoff@ycst.com
pkraman@ycst.com

*Attorneys for Plaintiffs ChromaDex, Inc. and Trustees of Dartmouth College*

22

## <u>CERTIFICATE OF SERVICE</u>

I, Adam W. Poff, hereby certify that on May 19, 2020, I caused to be electronically

filed a true and correct copy of the foregoing document with the Clerk of the Court using

CM/ECF, which will send notification that such filing is available for viewing and

downloading to the following counsel of record:

| | |
|---|---|
| Steven J. Balick | Donald R. Ware |
| Andrew C. Mayo | Peter G. Ellis |
| ASHBY & GEDDES | Jeremy A. Younkin |
| 500 Delaware Avenue, 8th Floor | Urszula Nowak |
| Wilmington, DE 19899 | Marco J. Quina |
| sbalick@ashbygeddes.com | FOLEY HOAG LLP |
| amayo@ashbygeddes.com | 155 Seaport Boulevard |
| | Boston, MA 02210 |
| | dware@foleyhoag.com |
| | pgellis@foleyhoag.com |
| | jyounkin@foleyhoag.com |
| | unowak@foleyhoag.com |
| | mquina@foleyhoag.com |
| *Attorneys for Defendant* | elysiumdelaware-dist@foleyhoag.com |

I further certify that on May 19, 2020, I caused the foregoing document to be served

via electronic mail upon the above-listed counsel.

Dated: May 19, 2020

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Adam W. Poff*
Adam W. Poff (No. 3990)
Pilar G. Kraman (No. 5199)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600
apoff@ycst.com
pkraman@ycst.com

*Attorneys for Plaintiffs ChromaDex, Inc. and
Trustees of Dartmouth College*