IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CHROMADEX, INC. and TRUSTEES )
OF DARTMOUTH COLLEGE,        )
                             )        **REDACTED PUBLIC VERSION**
                             )
        Plaintiffs,          )
                             )        C.A. No. 18-1434-CFC
    v.                       )
                             )
ELYSIUM HEALTH, INC.,        )
                             )
        Defendant.           )


**ELYSIUM'S OPENING BRIEF IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT (NO. 3) OF INVALIDITY UNDER 35 U.S.C. § 112**


*Of Counsel:*

Donald R. Ware
dware@foleyhoag.com
Jeremy A. Younkin
jyounkin@foleyhoag.com
Marco J. Quina
mquina@foleyhoag.com
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, Massachusetts  02210
Phone:  (617) 832-1000


Dated:  April 27, 2021

ASHBY & GEDDES
Steven J. Balick (#2114)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
sbalick@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Defendant*

{01683201;v1 }

# <u>TABLE OF CONTENTS</u>

I.   Summary of Argument ...................................................................................1

II.  Background...................................................................................................1

III.   Argument ....................................................................................................4

   A.  Plaintiffs' Arguments Fail to Apply the Court's Claim Construction .............4

   B.  The Claims of the Asserted Patents are Not Enabled......................................6

   C.  The Asserted Claims Lack Written Description ...............................................11

# TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                            <u>**Page**</u>

*Amgen Inc. v. Sanofi,*
     987 F.3d 1080 (Fed. Cir. 2021) ............................................................. 11, 12

*Ariad Pharmaceuticals v. Eli Lilly & Co.*,
     598 F.3d 1336 (Fed. Cir. 2010) ................................................................. 13

*Idenix Pharmaceuticals LLC v. Gilead Sciences Inc.*,
     941 F.3d 1149 (Fed. Cir. 2019) ........................................................ *passim*

*In re Wands*,
     858 F.2d 731 (Fed. Cir. 1988) ..................................................................... 7

*Wyeth & Cordis Corp. v Abbott Laboratories,*
     720 F.3d 1380 (Fed. Cir. 2013) ...................................................... 8, 10, 11

## I.     Summary of Argument

Adopting the definition of nicotinamide riboside in the patents'

specification, the Court construed "nicotinamide riboside" to mean "nicotinamide

riboside or a derivative (e.g., L-valine or L-phenylalanine esters) of nicotinamide

riboside." D.I. 152.  All four asserted claims are invalid because the specification

does not enable or describe the full scope of the claims, which encompass

thousands or more different compositions.  It would require massive brute force

testing to identify those compositions that meet the functional limitations of the

claims.  Plaintiffs do not challenge the underlying facts; instead, they disregard the

Court's construction and assert that the claims are limited to a subset of certain salt

and ester derivatives of NR.  Plaintiffs' refusal to follow the Court's construction

should not be rewarded; instead, the Court should grant summary judgment that the

claims lack enablement and written description.

## II.    Background[1]

Several elements of the asserted claims are relevant here.  First, is the

Court's construction of "nicotinamide riboside" (in all four asserted claims) as

including derivatives of nicotinamide riboside. D.I. 152.  Second, the claims of the

'807 patent include a functional limitation requiring that the claimed composition

---

[1] For the facts material to this motion, see the accompanying Third Statement of
Facts ("SF3"). Citations to exhibits ("Ex.") refer to the exhibits attached thereto.

"increase[] NAD+ biosynthesis upon oral administration" to an animal.  Ex. A;

D.I. 152.[2]  Third, the Court construed the "pharmaceutical composition" of the

'086 patent to include a functional limitation: it "can be used to improve or prolong

the health or well-being of humans or other animals." Ex. B; D.I. 152.

It is undisputed that there are "more than thousands" of derivatives of NR.

SF3-02; SF3-04.  The inventor of the patents, Dr. Brenner, testified that "someone

skilled in the art could make, you know, a very large number of nicotinamide

riboside derivatives."  Ex. C at 183-84.  When pressed, he explained:

> Q.  …. Can you quantify "very large" for me?"
>
> A.  Someone could—could try making thousands of nicotinamide
> riboside derivatives.  Someone could try to make more than
> thousands.

Ex. C at 183-84.

Elysium's expert, Dr. Adams, calculated that there are at least billions of NR

derivatives.  Ex. D at ¶¶ 776-791.  This calculation was unchallenged by Plaintiffs'

two technical experts (Drs. Larsen and Sobol) who, in their rebuttal reports, did not

opine on how many derivatives of NR there could be.  Ex. E at 261 ("Q:  Did you

---

[2] Although the composition as a whole must increase NAD+ biosynthesis, as
construed, the claims encompass compositions in which the quantities of other
NAD+ precursors, such as nicotinamide, are present in trace amounts, even as low
as a single molecule.  *See* D.I. 152 (tryptophan, nicotinic acid, and nicotinamide
need only be "found" in the composition).  Thus, the full scope of the claims
include compositions in which the NR alone must be responsible for the claimed
increase in NAD+ biosynthesis or improvement in health/welfare.

make any effort to determine how many different molecules or derivatives of nicotinamide riboside was in the scope of the claims?  A.  Did I – no."). *See also* Ex. F at pp. 358-386; Ex. G at pp. 7-18.  When pressed to enumerate how many derivatives of NR are possible, even just ester derivatives, both were unable, or unwilling, to provide a number.  SF3-04.  Dr. Larsen eventually conceded that even if the term derivatives were limited to the ester derivatives generated by modifying a single portion of an ester substituent on the NR molecule, that alone would create a class of at least thousands of derivatives.  SF3-03; Ex. H at 38-39.

It is also undisputed that identifying the compositions comprising NR derivatives that would increase NAD+ biosynthesis or improve health/welfare of any animal would require extensive, unpredictable, brute force testing.  SF3-05; SF3-05; SF3-07.  Dr. Brenner admitted that not every NR derivative would increase NAD:

> Q.  So would you expect all of those thousands of NR derivatives
> would function as NAD precursors?
>
> A.  No.

SF3-05.  Dr. Sobol stated:  "I am aware of no chemical properties that would demonstrate to a POSA that a compound is orally bioavailable.  Without actual testing, a POSA had no way of knowing whether NR is orally bioavailable."  SF3-06.  In his deposition, Dr. Sobol confirmed that testing would be required to determine whether an NR derivative was bioavailable and how it would impact

NAD biosynthesis.  SF3-07; Ex. E at 256-57, 270-74, 275-76.  Dr. Larsen, when

confronted with various potential NR derivatives, testified similarly that he had

"no way of knowing" if they increased NAD+ biosynthesis upon oral

administration, as he would "have to test it."  SF3-07; Ex. H at 90-93.  He also

testified that, even if limited to ester substituents at a single position on the NR

molecule, "you would have to test it."  SF3-07; Ex. H at 106-107.

## III.   Argument

### A.   Plaintiffs' Arguments Fail to Apply the Court's Claim Construction

As discussed below, and as the undisputed facts show, extensive, brute force

testing of at least thousands of compositions comprising NR derivatives would be

required to identify those meeting the functional requirements of the claims.

Consequently, the claims lack Section 112 support as a matter of law.  Plaintiffs

have not contested Elysium's contention that the claims, **_as construed by the_**

**_Court_**, are invalid under Section 112.  *See* Ex. G at ¶¶ 25-42; Ex. F at pp. 358-386.

Instead, Plaintiffs rely entirely on disregarding the Court's construction of

"nicotinamide riboside" and re-writing the claim to limit "nicotinamide riboside"

derivatives to a subset of certain salt and ester derivatives.[3]

---

[3] Drs. Larsen and Sobol assert that the salt and ester derivatives encompassed by
the claims are only those "understood to routinely and predictably deliver
nicotinamide riboside, either through dissolution or by esterase-catalyzed
hydrolysis, following oral administration."  Ex. G at ¶ 8; Ex. F at ¶ 1003.  This

Plaintiffs' refusal to follow this Court's construction should not be countenanced. This Court's construction was clear: nicotinamide riboside means "nicotinamide riboside or a derivative (e.g., L-valine or L-phenylalanine esters) of nicotinamide riboside." The Court did not limit this construction to nicotinamide riboside and a subset of salt or ester derivatives. Indeed, in their *Markman* brief, Plaintiffs argued, in the alternative, that if the term nicotinamide riboside was construed to include derivatives, it should be limited only to certain derivatives—specifically, salts—of NR. D.I. 99 at 11, n.5. The Court rejected that argument.

In any event, both Drs. Larsen and Sobol conceded that the plain and ordinary meaning of the term "derivative" to a person skilled in the art includes more than salts and esters. SF03-13. As Dr. Larsen conceded, "this patent doesn't try to describe or define the term derivative." Ex. H at 112. Instead, Drs. Larsen and Sobol rely on a paragraph in the specification that does not mention salts at all and lists two NR esters as *examples* of derivatives, not as limitations. Ex. F at ¶ 1008; Ex. G at ¶ 26. As the Court already explained in its *Markman* ruling analyzing this paragraph, "'nicotinamide riboside can be a derivative, *for example*,

---

limitation is conjured out of whole cloth, and appears nowhere in the specification (or the Court's construction). Moreover, Dr. Larsen admitted that a POSA would not know which ester derivatives of NR are hydrolyzed by esterases without testing them. Ex. H at 106-108. Dr. Sobol did not know either, and said he would have to consult with a chemist. Ex. E at 254-56. He admitted that testing would be necessary. *Id.* at 256-57.

L-valine or L-phenylalanine esters of nicotinamide riboside,' and that is at column 28, lines 63 through 65." Ex. I at 22 (emphasis added); *see also id.* at 25.

Drs. Sobol's and Larsen's arguments are inconsistent with other language in the specification, which describes as "derivatives" of a molecule various compositions that are ***not*** esters or salts of that molecule. In column 29, the specification references "cellulose, ***and its derivatives***, such as sodium carboxymethyl cellulose, ethyl cellulose and cellulose acetate." SF3-13. Dr. Larsen conceded that sodium carboxymethyl cellulose and ethyl cellulose are neither salts nor esters of cellulose. SF3-14.

Plaintiffs proffer no expert opinion that the asserted claims have Section 112 support if they encompass all derivatives of NR. Dr. Adams' opinions on behalf of Elysium, which faithfully apply the Court's construction, are undisputed.

## B.    The Claims of the Asserted Patents are Not Enabled

Under controlling law as applied to the undisputed facts, the claims lack enablement. Enablement requires that "the specification teach those in the art to make and use the invention without undue experimentation." *Idenix Pharms. LLC v. Gilead Scis. Inc.*, 941 F.3d 1149, 1154 (Fed. Cir. 2019) *quoting In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). A claim is not enabled if, as of the filing date, a POSA "could not practice their full scope without undue experimentation." *Id.*

When a claimed composition contains both structural and functional

limitations, the "key enablement question is whether a person of ordinary skill in

the art would know, without undue experimentation, which [compositions meeting

the structural limitations] would be effective for treating [the functional

limitations.]" *See Idenix*, 941 F.3d. at 1156.  Here, the claims of the asserted

patents include structural limitations—e.g., that the composition comprise NR or a

derivative of NR—as well as a functional limitation.  In the '807 patent, the

functional limitation is that the composition must increase NAD+ biosynthesis

upon oral administration.  In the '086 patent, the pharmaceutical composition, as

construed, must be capable of improving or prolonging the health or well-being of

an animal.  The undisputed facts establish, as a matter of law, that undue

experimentation would be required for a POSA to know which compositions

comprising NR derivatives meet the claims' functional requirements.

A court may find on summary judgment that claims are not enabled.  In

*Idenix*, the claims were construed to encompass compositions comprising a

nucleoside that could be derivatized with a methyl group at a single position on the

molecule.  941 F.3d at 1155.  This "allow[ed] nearly any imaginable substituent" at

this position.  *Id.*  The claims, as construed, required that the composition be

"effective for treatment of HCV."  *Id.*  It was undisputed that the claims

encompassed at least "thousands" of potential derivatives.  Screening thousands of

derivatives to identify the compositions that were effective, the Federal Circuit

held, was undue experimentation *as a matter of law*.  941 F.3d at 1162-63.

Similarly, in *Wyeth & Cordis Corp. v Abbott Labs.*, the district court construed the

claimed method of treatment to encompass a molecule (sirolimus) and any

derivatives made by substituting the molecule at a single carbon position.  720 F.3d

1380, 1382 (Fed. Cir. 2013).  The Federal Circuit held that assaying at least tens of

thousands of candidate molecules to identify the effective compositions was undue

experimentation *as a matter of law*.  720 F.3d 1380, 1276-77 (Fed. Cir. 2013).

The facts here are stronger.  It is undisputed that there are *at least* "more

than thousands" of potential NR derivatives, as inventor Dr. Brenner testified.

SF3-2.  Dr. Adams, Elysium's expert, opined that there are at least billions of

possible derivatives.  Ex. D at ¶¶ 773-791.  This opinion was unchallenged by

Plaintiffs' experts, who were unable (or unwilling) to quantify the number of NR

derivatives, even if the claims were limited to ester derivatives.  SF3-4; Ex. F at

358-386; Ex. G at 7-18; Ex. E at 266; Ex. H at 33-34, 36-40, 43-45.  In addition, in

*Idenix* the claimed derivatives were limited to a specific type of substitution at a

single location on the molecule.  The claims here are broader, and do not limit how

the NR can be derivatized.  As inventor Dr. Brenner admitted, "there are probably

three or four obvious locations where one would make derivatives" on the NR

molecule.  Ex. C at 180-81.

Even if the claims were limited to NR and its salt and ester derivatives, there still would be thousands of candidate derivatives.  In his deposition, Dr. Larsen conceded that even if derivatives were limited to those generated by modifying a single portion of an ester substituent on the NR molecule, that would result in a genus of at least thousands, as in *Idenix*.  SF3-3; Ex. H at 38-39.[4]  Plaintiffs present no evidence that the number of NR esters is any smaller than thousands.

Testing more than thousands (or thousands) of NR derivatives to identify those useful in compositions meeting the functional requirements of the claims would require extensive experimentation, in an unpredictable art.  As the Federal Circuit explained in *Idenix*, "[i]n cases involving unpredictable factors, such as most chemical reactions and physiological activity, the scope of enablement obviously varies inversely with the degree of unpredictability of the factors involved."  941 F.3d at 1161.  Plaintiffs' expert, Dr. Sobol, admitted he was "aware of no chemical properties that would demonstrate to a POSA that a compound is orally bioavailable.  Without actual testing, a POSA had no way of knowing whether NR is orally bioavailable."  SF3-6.  *Cf. Idenix*, 941 F.3d at 1163 (scientist stated, "you don't know whether or not a nucleoside will have activity

---

[4] In his opening report, Dr. Adams calculated that billions of NR derivatives exist using the example of amino acid ester derivatives.  Ex. D at ¶¶ 776-788.  *See also* Ex. J at ¶¶ 283-305.  This calculation was uncontroverted by Plaintiffs' experts.

against HCV until you make it and test it."); *Wyeth*, 720 F.3d at 1385 (scientist

testified "until you test compounds, you really can't tell if they work or not").

Plaintiffs' experts repeatedly stated in their testimony that one would need to test

NR derivatives to determine if they were orally bioavailable or would result in an

increase in NAD+ biosynthesis.  SF3-07.[5]

    This a stronger case than *Idenix* for additional reasons.  In *Idenix*, there

were, at least, four working examples.  That was still insufficient, given the

thousands of derivatives encompassed by the claims.  Here, by contrast, the

specification contains *zero* working examples in which Dr. Brenner tested a

composition comprising an NR derivative to determine whether it increased NAD+

biosynthesis upon oral administration or improved/prolonged health.  Indeed,

Plaintiffs have admitted that the specification does not describe the performance of

*any* experiments in which a composition formulated for oral administration

comprising isolated NR was orally administered to any human or animal.  SF3-08.

---

[5] Plaintiffs' experts have asserted that screening individual NR derivatives to determine their effectiveness would be "routine."  This assertion was rejected by the Federal Circuit in *Idenix* and *Wyeth* and cannot defeat summary judgment.  As the *Idenix* court explained, "Notwithstanding the fact that screening an individual compound for effectiveness was considered 'routine,' we concluded as a matter of law in *Wyeth* that the claim was not enabled because there were at least tens of thousands of candidate compounds and it would be necessary to first synthesize and then screen *each* candidate compound." *Idenix*, 941 F.3d at 1163 (emphasis original).  Regardless of how routine screening a single compound may be, screening thousands is undue experimentation, as a matter of law. *Id.*

The specification includes just two prophetic examples of NR derivatives—L-valine and L-phenylalanine esters—and speculates they might have improved pharmacokinetic properties.  SF3-09.  The specification also provides no guidance as to which NR derivatives would be effective to meet the functional limitations of the claims.

Similarly, in *Amgen Inc. v. Sanofi*, 987 F.3d 1080 (Fed. Cir. 2021), the Federal Circuit recently held that patents claiming antibodies defined by their function of binding to particular residues on a protein were not enabled, as a matter of law.  The court explained that broad functional limitations in claims "pose high hurdles in fulfilling the enablement requirement."  *Id.* at 1087.  The claims were invalid because identifying antibodies that met the functional requirements could be achieved only through laborious and unpredictable "trial and error" screening. *Id.* at 1088.  The same is true of the compositions here.  As in *Amgen*, "[t]he functional limitations here are broad, the disclosed examples and guidance are narrow, and no reasonable jury could conclude under these facts that anything but substantial time and effort would be required to reach the full scope of the claimed embodiments."  *Amgen*, 987 F.3d at 1088.  The claims lack enablement.

## C.    The Asserted Claims Lack Written Description

"To fulfill the written description requirement, a patent owner must convey with reasonable clarity to those skilled in the art that, as of the filing date sought,

he or she was in possession of the invention, and demonstrate that by disclosure in the specification of the patent." *Idenix*, 941 F.3d at 1163; *see also Ariad Pharms. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).  When the patent claims a genus, as here, the genus can be disclosed by "either a representative number of species falling within the scope of the genus or structural features common to the members of the genus so that one of skill in the art can visualize or recognize the members of the genus." *Idenix,* 941 F.3d at 1164.  In claims to compositions with functional limitations, the specification must provide "blaze marks to direct a POSA to the specific subset of [compositions] that are effective in treating [the functional limitation]." *Id.*

Written description "is part of the *quid pro quo* of a patent" and protects against inventor overreach.  *See Ariad*, 598 F.3d at 1345.  Here, the applicant chose to define NR broadly by including derivatives, thus allowing it to assert infringement over a much wider array of potential compositions.  In exchange, the law demands written description supporting that breadth.  The Asserted Patents lack sufficient description to show that Dr. Brenner possessed and invented the genus of NR derivatives able to be combined with other NAD+ precursors in compositions to increase NAD+ biosynthesis or improve/prolong the health or well-being of animals.  As discussed above, the patents contain no working examples of a composition comprising an NR derivative that was administered to

any animal.  SF3-08.  The only species of NR derivatives disclosed are the NR

phenylalanine esters and NR valine esters, and even those were not tested.  SF3-09.

This is far from a representative sample of all the potential NR derivatives, or even

of the at least thousands of potential NR esters.  SF3-02; SF3-03.

The specification, moreover, does not identify what structural features are

common to those NR derivatives able to be used in a composition that satisfies the

claims' functional limitations.  SF3-10; SF3-11.  Dr. Sobol conceded, "I am aware

of no chemical properties that would demonstrate to a POSA that a compound is

orally bioavailable."  SF3-06.

*Idenix* again is instructive.  There, the Federal Circuit reversed a denial of

judgment *as a matter of law*, holding that the failure of the specification to

distinguish "effective from ineffective compounds" doomed the claims for lack of

written description.  Just as in *Idenix*, the Asserted Claims here do not explain

"what makes [some derivatives] effective, or why."  *Id.*  The patents leave it up to

the skilled artisan to identify effective compounds through laborious, brute force

testing.  That is a research plan, not a written description.  As the *en banc* Federal

Circuit has emphasized, "research hypotheses do not qualify for patent protection."

*Id.*  "A patent is not a hunting license.  It is not a reward for the search, but

compensation for its successful conclusion."  *Id.*  Here, the claims leave undone

the hard work of identifying which compositions comprising the "more than

thousands" of NR derivatives effective to satisfy the claims' functional limitations.

The claims lack written description.

|  |  |
|---|---|
| *Of Counsel:* | ASHBY & GEDDES |
|  | */s/ Andrew C. Mayo* |
| Donald R. Ware | _____ |
| dware@foleyhoag.com | Steven J. Balick (#2114) |
| Jeremy A. Younkin | Andrew C. Mayo (#5207) |
| jyounkin@foleyhoag.com | 500 Delaware Avenue, 8th Floor |
| Marco J. Quina | P.O. Box 1150 |
| mquina@foleyhoag.com | Wilmington, DE  19899 |
| FOLEY HOAG LLP | (302) 654-1888 |
| 155 Seaport Boulevard | sbalick@ashbygeddes.com |
| Boston, Massachusetts  02210 | amayo@ashbygeddes.com |
| Phone:  (617) 832-1000 |  |
|  | *Attorneys for Defendant* |
| Dated:  April 27, 2021 |  |

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type, font and word limitations set forth in this

Court's Standing Order Regarding Briefing in All Cases, dated November 6, 2019.

This brief contains 3219 words (excluding the title page, table of contents, table of

authorities, signature block, and certificate of compliance).  This brief has been

prepared in 14-point Times New Roman font.

Date: April 27, 2021

ASHBY & GEDDES

*/s/ Andrew C. Mayo*

_____
Steven J. Balick (#2114)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
sbalick@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Defendant*